**UNITED STATES of America**

v.

**Emilio L. IPPOLITO, et al.**

**No. 96–64–CR–T–23E.**

United States District Court,
M.D. Florida,
Tampa Division.

June 9, 1998.

___

See also, 930 F.Supp. 581.

Ernest F. Peluso, U.S. Attorney's Office, Tampa, FL, for U.S.

Thomas H. Ostrander, Bradenton, FL, for Emilio L. Ippolito.

Ronald F. Smith, New Port Richey, FL, for Susan Mokdad.

Brian L. Weakland, Tampa, FL, for John J. Gentz.

Brent D. Armstrong, Clearwater, FL, for Phillip Marsh.

Douglas J. Carpa, Tampa, FL, pro se.

Frederick W. Vollrath, Tampa, FL, for Douglas J. Carpa.

Bjorn Erik Brunvand, Clearwater, FL, for Richard Allen Brown.

Daniel F. Daly, Tampa, FL, for Charles P. Dunnigan.

Stephen M. Crawford, Tampa, FL, for Jack W. Warren.

Rosanne L. Brady, Tampa, FL, for Jack M. Franz.

Anne F. Borghetti, St. Petersburg, FL, for Laurent J. Moore.

### ORDER

MERRYDAY, District Judge.

The Court must resolve a dispute that originated during *voir dire* examination of prospective juror 505 and results in both an attack by the convicted defendants on the jury's verdict and a consequent request for a new trial. (Docs. 778–2, 778–3, 778–4, 778–5, 786–2, 786–3, 786–4, 786–5, 835–2, 835–3, 835–4, 835–5, 839–1, 846–1, 859–1, 859–2, 859–3, 859–4, 859–5, 861, 863, 878, and 897).

On February 19, 1997, the Court entered an order granting the motion of the United States for an innominate jury (Doc. 389).[1] As stated in a February 19, 1997, order and explained further throughout the record, the Court chose to empanel an innominate jury to preserve the integrity of the proceedings, protect the safety and well-being of the jurors, and ensure a fair trial. Involving well-documented allegations of jury tampering and obstruction of justice by individuals who proudly position themselves athwart the law, the nature and circumstances of the case offered no reasonable alternative.

Papers submitted by the United States demonstrated a refined ability by the defendants to effectively disrupt federal criminal trials, an adeptness earlier deployed purposefully in San Francisco, California, and Orlando, Florida, by threatening and intimidating judicial officers, jurors, and others. The defendants' tactics in the Orlando proceedings, for example, caused a motion for mistrial and the eventual dismissal of a juror who felt compelled to approach the presiding judge (Judge Robert R. Merhige, Jr., visiting from the Eastern District of Virginia) with concerns about the juror's personal safety and the safety of his fellow jurors. The defendants' unruly and impetuous conduct before trial in this case offered neither comfort nor just cause to discount the defendants' ability and willingness to further their obstructive designs. *See U.S. v. Ross,* 33 F.3d 1507 (11th Cir.1994). Coupled with developing media interest in the case, the identification of jurors posed a distinct and imminent danger of improper influence and intimidation of the jury.

A discrete but energetic sector of the public enthusiastically shares the defendants'

---

1. I prefer the term "innominate" jury to "anonymous" jury. "Anonymous" evokes an image of the clandestine, forbidden, and obscure, which suggests darkly a jury panel of individuals furtively selected without knowledge or participation by the defendants. The use of "anonymous" effects a detrimental, rhetorical concession to the critics. This jury was selected in public, in the presence of the defendants and their counsel and stand-by counsel, and in full view of the press and interested onlookers (including family members and sympathizers of the defendants, as well as neutrals, both casual and curious). All participants enjoyed an opportunity to formulate questions, request that the Court pose the questions, and preserve any objections if the Court declined the question. This jury is in no meaningful sense "anonymous". Much was known about the jurors and more could have been known had anyone been concerned enough to ask. In fact, the questioning was more than adequate. The only facts not known were name, address, and exact place of work. The jury stood merely innominate; all else was fair game.

views. Publications distributed by groups such as the "Fully Informed Jury Association" actively solicited sympathizers to assist the defendants in "fully informing" the jury. (This includes a naked appeal for so-called jury nullification, as well as the usual, more fanciful claims.) Presumed sympathizers of the defendants have mailed anonymous letters to the Court in a hapless effort to influence these proceedings in favor of the defendants by leveling craven and loathsome threats against the Court.[2] Without satisfactory protection, the jurors would undoubtedly have been the targets of similar threats and attempts at intimidation. Given the specific charges against the defendants in this case, including charges of obstruction of justice and jury tampering, such threats and attempts at intimidation would have irretrievably tainted the jurors' impartiality and compromised the fundamental integrity of the trial.

Before *voir dire*, the Court assigned an identification number for each prospective juror and prohibited the Clerk and the jurors from disclosing the venire's names, addresses, and places of employment. On May 27, 1997, the Court amended its February 19, 1997, order to prohibit any conduct designed to identify or locate the venire (Docs. 569 and 570). The Court empaneled an innominate jury with twelve jurors and six alternates.

Immediately following extensive *voir dire*, the case proceeded to jury trial, which continued through August 13, 1997. At the end of the evidence but before deliberation, the Court excused a juror upon a motion from the defense. As a result, Juror Number 505 ("Juror 505"), the first alternate, advanced into the panel of twelve petit jurors. Juror 505 subsequently participated in deliberations and remained present during announcement of the verdicts on August 13, 1997.

The jury returned mixed verdicts (Doc. 694). One defendant, Richard Allen ("Toby") Brown, was acquitted of all charges.[3] Six of the seven remaining defendants were acquitted of at least one count. Only one defendant, Douglas J. Carpa, was convicted of all the charges against him in the indictment.

After the Court polled the jury regarding their verdict, the Court thanked the jury for its dedicated service and reminded the panel of its duty not to reveal the names of other jurors to unauthorized persons. The Court admonished government counsel, defendants' attorneys, defendants, and associates to refrain from attempting to determine the identities of the trial jurors and alternates.[4]

After trial, an attorney in Pinellas County, Mr. Robert Gaskin, contacted Thomas Ostrander, counsel of record for the defendant Emilio L. Ippolito, and suggested that a juror, now identified as Juror 505, was disqualified from federal jury service due to felony convictions in Florida. Mr. Ostrander properly declined to inquire further into Mr.

---

**2.** The Court referred these communications to the United States Marshal and the Federal Bureau of Investigation. Criminal investigations are pending. The Court entered in the record some of the colorful letters received from identified authors who are sympathetic to the defendants (e.g., Docs. 775, 781, 790, and 805).

**3.** On April 6, 1998, the Court entered a judgment of acquittal as to this defendant.

**4.** I pause momentarily to note the extraordinary service of the eighteen men and women comprising this jury panel. Twelve jurors and six alternates labored with attention and discipline, punctuated by a noticeably good spirit, for twelve weeks throughout the summer months. On every working day every juror appeared on time and at the appropriate place (a remote parking place designated by the U.S. Marshal) to ride a bus to the courthouse. The extent of the security effort focused on these jurors was not apparent to them or known to the public, although surely the evidence in the case and the nature of the charges, viewed together with the daytime closeness of the jurors' confinements, alerted them that something was afoot. Nonetheless, they all remained relaxed yet determined to complete their assignment fairly. My visit to the jury room after the trial revealed unmistakable signs of the organized analysis and debate that occurred among them—proceeding defendant by defendant and claim by claim, then delivering quite a mixed (but not mixed-up) verdict. The noble service of these jurors remains within the ready recollection of all who observed them. For myself, I have never seen such a group or been more favored than to preside over the trial they resolved.

Gaskin's allegations, instead choosing to communicate the allegations to the Court in a November 4, 1997, letter. By order dated November 14, 1997, the Court published Mr. Ostrander's letter in the record (Doc. 774). The Court asked the Federal Bureau of Investigation ("FBI") to investigate the facts surrounding Mr. Gaskin's allegations. The FBI assigned Special Agent Robert Coffin to conduct the investigation.

The defendants moved for a mistrial based on the allegations concerning Juror 505. On April 6 and April 8, 1998, the Court held hearings on the motions. Subject to cross-examination by the defendants, Special Agent Coffin testified regarding the results of his investigation.[5] On April 7, 1998, with the Court's permission and by agreement of the parties, Anne F. Borghetti, counsel for defendant Laurent J. Moore, acting as representative for the defense, actively participated in and confirmed Special Agent Coffin's compilation of Juror 505's criminal record.

Special Agent Coffin testified, and the record attests, that Juror 505 has never been convicted of a federal or state felony offense. Further, the state and federal governments have never suspended or terminated the juror's civil rights, including his rights to vote and sit on a jury. Indeed, Juror 505 voted just weeks before he was called to service in this case. During his service in this case, Juror 505 also had no felony charges pending against him. Accordingly, Juror 505 satisfied the statutory qualifications to serve as a juror pursuant to 28 U.S.C. § 1865.

Nevertheless, Juror 505 has had his share of collisions with the law. The record demonstrates that Juror 505 was charged with a crime eight times. Charges involving the purchase of beer for a minor and a domestic dispute were dropped. However, on April 20, 1988, Juror 505 was adjudged guilty of disorderly conduct (misdemeanor) charges stemming from alleged "fighting words" by the juror in a brief altercation with a "crowd"

of individuals who allegedly damaged the juror's vehicle. The state court assessed minor fines. On June 5, 1989, adjudication was withheld on burglary and grand theft (third degree felony) charges involving a compact disc player that the juror allegedly removed from a friend's vehicle. The state court imposed thirty months of probation and assessed small fines and costs. On September 26, 1991, adjudication was withheld on a charge of probation violation. The state court imposed terms of one year of community control, two years of probation, and two years of suspended sentence. Probation terminated on December 2, 1994. On June 5, 1989, Juror 505 pled no contest to a traffic charge involving a suspended or revoked license. The state court sentenced the juror to six months of Salvation Army Probation; the case was dismissed on June 5, 1989. On July 6, 1990, adjudication was withheld on a misdemeanor charge for writing a check with insufficient funds. The state court placed Juror 505 on probation for one year. Finally, on October 14, 1996, Juror 505 pled no contest to a traffic charge involving a suspended or revoked license. The juror's prior traffic infractions upgraded the offense to a third degree felony, *but adjudication was withheld*. The juror netted a sixty-day jail term and eighteen months of probation. Juror 505 was on probation for this offense *during the trial of this case*. Earlier this year, the state court dissolved the juror's sixty day jail term.

As with all jurors in this case, Juror 505 received a subpoena ordering him to appear for jury duty. The juror informed his probation officer of his jury summons and his jury service. The probation officer checked the juror's criminal record and cleared the juror for jury service.

*Voir dire* commenced on May 28, 1997. The Court permitted the parties to suggest any questions for the jury during *voir dire*. The Court advanced all relevant inquiries suggested from counsel and the *pro se* defen-

---

**5.** To this extent, the defense motion for an evidentiary hearing (Doc. 839–2) is **GRANTED** *nunc pro tunc.*

dants, including the following question: "Have any of you ever been charged with a crime? And by that I mean something that you understood might result in being imprisoned if you were convicted." Tr. Vol. 4 at p. 147, lines 13–16. The Court then questioned prospective jurors who responded affirmatively. When reaching Juror 505, the Court asked, "How about 505?" Tr. Vol. 4 at p. 148, lines 3–6. Juror 505 responded, "I was stopped last year and charged with driving with a suspended license. It was an unpaid traffic ticket. It has since been resolved, no problem." Tr. Vol. 4 at p. 148, lines 3–6. The Court moved directly to the next prospective juror. Neither the United States nor the defendants sought further information regarding Juror 505 or his responses to the Court. In fact, at the end of the day, the government's protests notwithstanding, the defense team sought successfully to prevent resumption of questioning at the onset of the next day's court session. Tr. Vol. 5 at p. 87–89.

After post-trial allegations of juror misconduct surfaced, the Court was presented with sufficient evidence and data to conclude that—contrary to the orders of the Court—one or more individuals, perhaps associates of one or more of the defendants, endeavored successfully to discover the identity of Juror 505. These individuals have learned Juror 505's full name, home address, place of employment, social security number, Florida driver's license number, telephone numbers, automobile registration data, and other personal information useful in locating and contacting Juror 505. Indeed, the Court confirmed that these same individuals also published personal information about Juror 505 on sundry "websites" located on the Internet.[6] Of course, publication on the Internet makes the information about Juror 505 available to millions of people around the world.

In *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), a juror had failed entirely to respond during *voir dire* to an attorney's question calculated to elicit whether any prospective juror or a family member had sustained an injury that resulted in "disability or prolonged pain and suffering." The plaintiff had received an injury from the blades of a riding lawn mower; the reticent juror's son had suffered from injuries consequent upon an exploding truck tire. After an adverse verdict, the defendants sought a new trial and asserted the juror's failure to answer the attorney's question to the venire.

Referring to 28 U.S.C. § 2111 and Rule 61, Federal Rules of Civil Procedure, the Supreme Court dismissed the notion that a harmless error involving the jury entitles a litigant to a new trial and emphasized that a perfect trial is unavailable because no trial is perfect. (The perfect trial is featured only in fancy and hypothesis .) The Supreme Court, commenting on the quality of a trial, stated:

> This Court has long held that " '[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials." (citations omitted) Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing case load.

104 S.Ct. at 848.

> *To invalidate the result of a three-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.* A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination. Whatever the

---

**6.** For example, refer to $http://www.illu-sions.com/opf/obstrjust03.htm<.

merits of the Court of Appeals' standard in a world which would redo and reconstruct what had gone before upon any evidence of abstract imperfection, we think it is contrary to the practical necessities of judicial management reflected in Rule 61 and § 2111.

104 S.Ct. at 849. (emphasis added).

The Supreme Court evaluated the exchange between counsel and the prospective juror during *voir dire* and concluded that the juror's answer, that is, his omission, resulted in incomplete and erroneous information but that the omission was not pre-emptive of an impartial jury, a right available to every litigant, civil and criminal. The Court, in the majority opinion of Chief Justice Rehnquist, specified the governing principle of law:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

104 S.Ct. at 849.

Even the concurring opinion of Justices Brennan and Marshall stated a premise supportive of Chief Justice Rehnquist's formulation:

> More specifically, to be awarded a new trial, a litigant should be required to demonstrate that the juror incorrectly responded to a material question on voir dire, and that, under the facts and circumstances surrounding the particular case, the juror was biased against the moving litigant. *See, e.g., McCoy v. Goldston,* 652 F.2d 654, 659–660 (C.A.6, 1981).

104 S.Ct. at 851.

■ The relatively simple holding of the majority through Justice Rehnquist pervades the three opinions in *McDonough.* Defendants "are not entitled to a new trial unless

the juror's failure to disclose denied respondents their right to an impartial jury." 104 S.Ct. at 846–47.

In *BankAtlantic v. Blythe Eastman Paine Webber, Inc.,* 955 F.2d 1467 (11th Cir.1992), BankAtlantic sued Paine Webber, which was retained as a financial adviser, and alleged breach of contract, negligence, and other claims for relief arising from Paine Webber's putative failure to properly advise BankAtlantic of the potential adverse consequences of using interest rate swaps, a sophisticated financial "hedging" technique. After the trial, Paine Webber was acquitted of liability by the jury but appealed an adverse judgment on the pleadings entered by the trial judge.

During the pendency of the appeal, BankAtlantic filed two motions attacking the jury verdict. First, BankAtlantic asserted that the jury foreman, contrary to the court's order, had read a newspaper article discussing the trial and including evidence excluded by the trial judge. Only one juror read the article and no other juror knew of the article or its contents. The newspaper article was not especially inflammatory and was merely cumulative of evidence properly admitted into the record. The district court found neither a reasonable possibility nor actual prejudice arising from this infraction by the juror. The circuit court agreed.

■ BankAtlantic next raised the matter of allegedly false answers by jurors during *voir dire.* One juror allegedly failed to reveal his employment as a real estate salesman by a former classmate of one of Paine Webber's trial lawyers. The other juror allegedly failed to reveal several criminal and one civil judgment against him. The Eleventh Circuit first summarized the Supreme Court's test for prejudice as expounded in *McDonough* and further refined the terms of the test:

> The first prong of the *McDonough* test requires a determination of whether the juror's answers were honest, "that is, whether he was aware of the fact that his answers were false." *United States v.*

*Perkins,* 748 F.2d 1519, 1531 (11th Cir. 1984). The second prong, that a correct response would have provided a valid basis for a challenge for cause, requires a showing of actual bias. *Id.* at 1532; *see also United States v. Casamayor,* 837 F.2d 1509, 1515 (11th Cir.1988).

. . . . .

"Actual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" *Id.* (quoting *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976).)

955 F.2d at 1473.

 This "first prong" (I am not fond of "prongs") is a test of subjective honesty rather than a test of the correctness or accuracy of a juror's answer during *voir dire.* Although an obvious and simple distinction, the difference between accuracy and honesty is often blurred by polemical exchanges in the courtroom or by the tortuous course of public controversy. An answer that is manifestly nonsensical or incredible may evidence dishonesty, but merely answering in a manner that proves to be in error is not, per se, dishonesty. The amorphous realm of law, legal terms, and legal classifications offers an especially treacherous obstacle to accuracy and leaves ample opportunity for error and inaccuracy to coexist peaceably with honesty. Without respect to the accuracy of a juror's answer, only dishonesty implicates remediable misbehavior by a juror. Dishonesty is not inherent in mistaking or misunderstanding the distinction between a misdemeanor and a felony or in misjudging the taxonomic effect of a withheld adjudication.

 The notion of bias—the "second prong"—is simple in the context of the defendants' objectives in choosing among prospective jurors. Bias is an unjustified, mobilized tendency or willingness to convict a defendant without impartial consideration of all the evidence and without disciplined deference to the court's instructions on the law.

A defendant is entitled during jury selection to cause the discharge of any juror who evinces a bias, especially a hostile and galvanized bias against the defendant. Neither the government nor the defendant is entitled as a matter of right to an angelic and perfectly discerning jury or, on the other hand, a gullible jury, willing to accept a party's preferred version of the facts without respect to the weight of the evidence or the plausibility of the claim. A defendant is not immune from jurors who have experiences, views, and proclivities. A defendant is immune only from a juror with a pertinent and demonstrable bias, one who will not listen with attentiveness and equanimity.

 In this case, Juror 505 and others were asked, by one way or the other, if any had been convicted of a crime that might land them in jail. Juror 505 conceded a charge of driving with a suspended license and referred to an unpaid ticket. Neither the Court nor any lawyer or *pro se* defendant showed any interest in the matter. No questions were suggested about the charge underlying the ticket or the reason for suspending the driver's license. No one had any interest, probably because Juror 505 had already discussed some significant personal inconveniences associated with jury service and the defense may have thought that the government would challenge Juror 505. Who knows? The facts are that no one said anything and the process proceeded to conclusion.

The transcript fails to preserve the length of time after Juror 505's answer and before the first question to the next juror, but the focus shifted to Juror 552 without a material pause. Juror 505 said nothing further. Here it is again:

THE COURT: Okay. How about 505?

JUROR 505: I was stopped last year and charged with driving with a suspended driver's license. It was an unpaid traffic ticket. It since has been resolved, no problem.

THE COURT: All right. Mr. 552?

Tr. Vol. 4 at p. 148, lines 3–7.

The transcript undoubtedly reveals that Juror 505's answer contains less than his

entire record with law enforcement. However, Juror 505 affirmatively lied about nothing. The transcript leaves open, among other things, the possibilities that another question or so would have drawn out Juror 505's entire history, that his reticence may have been caused by embarrassment, or that other considerations intruded. We do not know. However, for the purpose of this motion, I shall indulge the dicey presumption that, to at least some extent, Juror 505 consciously failed to report his record.

*The fact remains that Juror 505 is not a felon.* On June 23, 1996, he was charged with driving with a suspended license. On October 14, 1996, a Florida judge withheld adjudication (hence, no felony conviction) and assessed eighteen months of probation and sixty days in jail—the classic signs of a misdemeanor. The sixty days in jail was later quashed by the judge based upon Juror 505's satisfactory behavior and some level of concern for his safety after service as a juror in this proceeding. (Judge Baird submitted an explanatory affidavit.) The other charges against Juror 505, as shown by the record compiled by the FBI and supplemented by other proof, are much less weighty than felonies and arose in circumstances of some ambiguity as to his degree of fault. His record is one characterized by some youthful drinking, a formerly quick temper, and lamentable driving habits. I neither excuse him nor condemn him, but he is not a felon who is without civil rights and unqualified for jury service.

The record is utterly silent on the issue of bias. The record includes no evidence that is susceptible to a rational and informed suspicion of bias. The verdicts in this case included the outright acquittal of "Toby" Brown and at least one count of acquittal for all defendants except Carpa, who largely conceded the facts and relied quixotically on some richly fictitious conceptions of the District of Columbia code, the Maryland code, and a 1930's treaty between the United States and some Central American nations concerning an inter-American highway. Conviction was sure to follow.

The existence of acquittals among the several defendants is a persuasive (although, not conclusive) signal of an independent, impartial, and thoughtful group of jurors, exerting themselves in an effort to honestly perform their task. A compromised juror, committed to procuring ill-gotten convictions, should yield results quite apart from the verdicts in this case.

One or more of the defendants advance a conspiracy theory that posits the subtle and incorporeal power of Assistant United States Attorney Ernest F. Peluso and his colleagues to force Juror 505 to behave in accordance with their bidding by manipulation of a state court judge and the probation officers acting at his behest. The idea may not be as implausible as it seems but, even if somehow conceivable, the record presents nothing (except unleavened speculation) in the nature of persuasive or even plausible evidence that is sympathetic to the yarn that defendant Carpa entitles the "captive juror" argument. In plain fact, this claim is the last resort of an otherwise disarmed defense. The required burden of proof remains wholly unsatisfied.

In sum, having failed to establish that Juror 505 was either unqualified or biased, the defendants' attempts to oppugn the jury and its verdicts are DENIED, as are each and all of the motions identified in paragraph one on page one of this order. For the record, although omissions occurred, I am unconvinced that Juror 505 actively elected to withhold or deflect but, if he did, he sought not to effect a deception but to minimize his embarrassment. Juror 505 was not among the criminals present during this trial.