**UNITED STATES of America**

v.

**Emilio L. IPPOLITO.**

**No. 8:96–CR–64–T–23TBM.**

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 8, 2003.

Ernest F. Peluso, United States Attorney's Office, Tampa, FL, for Plaintiff.

Thomas H. Ostrander, Bradenton, FL, for Defendants.

### ORDER

MERRYDAY, District Judge.

This action recurs in the district court consequent upon *United States v. Carpa*, 271 F.3d 962 (11th Cir.2001) (*"Carpa"*), which affirms the conviction of each of the criminal defendants but remands the action for further inquiry concerning a juror.

The district court's earlier opinion on the matter to which this remand is directed, *United States v. Ippolito*, 10 F.Supp.2d 1305 (M.D.Fla.1998), provides a useful summary of the pertinent background, a review of which is helpful to a balanced and contextual understanding of the present dispute. Included in that earlier summary is an explanation for the innominate jury employed during the trial:

> [T]he Court chose to empanel an innominate jury to preserve the integrity of the proceedings, protect the safety and wellbeing of the jurors, and ensure a fair trial. Involving well-documented allegations of jury tampering and obstruction of justice by individuals who proudly position themselves athwart the law, the

nature and circumstances of the case offered no reasonable alternative.

Papers submitted by the United States demonstrated a refined ability by the defendants to effectively disrupt federal criminal trials, an adeptness earlier deployed purposefully in San Francisco, California, and Orlando, Florida, by threatening and intimidating judicial officers, jurors, and others. The defendants' tactics in the Orlando proceedings, for example, caused a motion for mistrial and the eventual dismissal of a juror who felt compelled to approach the presiding judge (Judge Robert R. Merhige, Jr., visiting from the Eastern District of Virginia) with concerns about the juror's personal safety and the safety of his fellow jurors. The defendants' unruly and impetuous conduct before trial in this case offered neither comfort nor just cause to discount the defendants' ability and willingness to further their obstructive designs. *See U.S. v. Ross,* 33 F.3d 1507 (11th Cir.1994). Coupled with developing media interest in the case, the identification of jurors posed a distinct and imminent danger of improper influence and intimidation of the jury.

A discrete but energetic sector of the public enthusiastically shares the defendants' views. Publications distributed by groups such as the "Fully Informed Jury Association" actively solicited sympathizers to assist the defendants in "fully informing" the jury. (This includes a naked appeal for so-called jury nullification, as well as the usual, more fanciful claims.) Presumed sympathizers of the defendants have mailed anonymous letters to the Court in a hapless effort to influence these proceedings in favor of the defendants by leveling craven and loathsome threats against the Court.... The Court entered in the record some of the colorful letters received from identified authors who are sympathetic to the defendants (e.g., Docs. 775, 781, 790, and 805).

10 F.Supp.2d at 1307–08, n. 2.

Although much additional time was committed both before and after, the trial persisted for twelve weeks and eighteen jurors served earnestly throughout. 10 F.Supp.2d at 1308, n. 4. After extensive deliberation, the jury returned mixed verdicts. (Doc. 694) Richard Allen "Toby" Brown was completely acquitted, i.e., acquitted on eight of eight counts. All but one other defendant was acquitted on at least one count: Emilio L. Ippolito was acquitted on four of eighteen counts, Susan L. Mokdad was acquitted on five of fifteen counts, Philip Marsh was acquitted on one of five counts, Douglas J. Carpa (who appeared *pro se*) was acquitted on one of five counts, Jack Wade Warren was acquitted on two of twelve counts, and Laurent Jacques Moore was acquitted on two of twelve counts.[1] Charles P. Dunnigan was convicted on each of seven counts.[2]

After the trial and consistent with the history of their attacks on the judicial process, the defendants launched an attack directed at Juror 505. The allegations (although they shift markedly from time to time) were (1) that Juror 505 was unqualified to serve as a juror because he was a convicted felon and (2) that, owing to some very loosely imagined scheme, Juror 505's

---

1. Defendants Mokdad and Marsh have died after serious illnesses.

2. The district court's earlier opinion incorrectly identified Douglas J. Carpa as the defendant convicted on all counts. 10 F.Supp.2d at 1308.

integrity or impartiality was compromised, albeit in some uncertain manner arising from the probation assessed against him by a State of Florida court. The defendants suggested both deception by Juror 505 during *voir dire* and bias against the defendants during Juror 505's deliberation as a juror.

Further, the circuit court in *Carpa* affirmed each conviction but remanded the case for an inquiry arising from the accusations against Juror 505. The court of appeals instructed as follows:

> There seems now to be an insufficiently investigated possibility that Juror 505 was both dishonest and biased during *voir dire* and throughout the trial. The district judge had broad discretion to investigate Juror 505, but he never questioned the juror himself and did not establish a sufficient evidentiary record either to determine whether Juror 505 was honest and unprejudiced or to allow us to review the determination.
>
> . . . .
>
> On remand and after a proper investigation by the district court, including his own questioning of the juror in camera if necessary (and cross-examination of the juror by defense counsel unless the district court finds such an examination too risky and sets out specific reasons for the finding), the district judge must redetermine whether Juror 505 was ever convicted of or had a charge pending for a felony under 28 U.S.C. § 1865(b)(5), and whether Juror 505's response to the court questioning could have been honestly mistaken or, even if technically accurate, was deliberately intended to deceive to permit him to serve on this jury.

271 F.3d at 967–68.

■ I have conducted the inquiry directed by the court of appeals. I have appointed counsel for Juror 505 and summoned him to a hearing at which every party was permitted examination. I have again considered his encounters with law enforcement, accurately summarized in my earlier opinion as follows:

> The record demonstrates that Juror 505 was charged with a crime eight times. Charges involving the purchase of beer for a minor and a domestic dispute were dropped. However, on April 20, 1988, Juror 505 was adjudged guilty of disorderly conduct (misdemeanor) charges stemming from alleged "fighting words" by the juror in a brief altercation with a "crowd" of individuals who allegedly damaged the juror's vehicle. The state court assessed minor fines. On June 5, 1989, adjudication was withheld on burglary and grand theft (third degree felony) charges involving a compact disc player that the juror allegedly removed from a friend's vehicle. The state court imposed thirty months of probation and assessed small fines and costs. On September 26, 1991, adjudication was withheld on a charge of probation violation. The state court imposed terms of one year of community control, two years of probation, and two years of suspended sentence. Probation terminated on December 2, 1994. On June 5, 1989, Juror 505 pled no contest to a traffic charge involving a suspended or revoked license. The state court sentenced the juror to six months of Salvation Army Probation; the case was dismissed on June 5, 1989. On July 6, 1990, adjudication was withheld on a misdemeanor charge for writing a check with insufficient funds. The state court placed Juror 505 on probation for one year. Finally, on October 14, 1996, Juror 505 pled no contest to a traffic charge involving a suspended or revoked license.

The juror's prior traffic infractions upgraded the offense to a third degree felony, *but adjudication was withheld*. The juror netted a sixty-day jail term and eighteen months of probation. Juror 505 was on probation for this offense during the trial of this case. Earlier this year, the state court dissolved the juror's sixty day jail term.

10 F.Supp.2d at 1309. After a complete inquiry on remand, I again find (or "redetermine," as the circuit court stated) that Juror 505 is not a convicted felon, no felony pended when he became a juror, he retains his civil rights, and he was and is qualified for service as a juror. His last traffic infraction became technically a felony charge but adjudication was withheld and probation imposed. No other conclusion is warranted (or possible). The defendants' effort to transmogrify an "adjudication withheld" into a felony conviction or, at least, a pending felony charge, is wholly without merit. In other words:

> *The fact remains that Juror 505 is not a felon.* On June 23, 1996, he was charged with driving with a suspended license. On October 14, 1996, a Florida judge withheld adjudication (hence, no felony conviction) and assessed eighteen months of probation and sixty days in jail—the classic signs of a misdemeanor.

The sixty days in jail was later quashed by the judge based upon Juror 505's satisfactory behavior and some level of concern for his safety after service as a juror in this proceeding. (Judge Baird submitted an explanatory affidavit.) The other charges against Juror 505, as shown by the record compiled by the FBI and supplemented by other proof, are much less weighty than felonies and arose in circumstances of some ambiguity as to his degree of fault. His record is one characterized by some youthful drinking, a formerly quick temper, and lamentable driving habits. I neither excuse him nor condemn him, but he is not a felon who is without civil rights and unqualified for jury service.

10 F.Supp.2d at 1313.[3]

■ The remaining issue concerns whether Juror 505 was biased. After the mandated inquiry, I conclude again that Juror 505 was manifestly NOT biased. I have carefully observed his demeanor during his testimony and evaluated his answers to the questions by the United States, by counsel for each represented defendant, by one *pro se* defendant (Carpa), and by the court. I find as a matter of fact that Juror 505 is honest and straightforward, although neither eloquent nor legally sophisticated.[4] The accusation

---

**3.** At page 14 of its memorandum of law (Doc. 1296), the United States presses a point that is obvious but quite pertinent:

> The Court should note that if Matthew Finch's criminal record implies any bias, it is a bias in favor of the defendants, and against the interest of the government. *See United States v. Quilca–Carpio*, 118 F.3d 719, 722 (11th Cir.1997). In *Quilca–Carpio*, the Eleventh Circuit noted in a per curiam opinion that the Court could conclude that the bias conceded by a juror, which was due to the fact that his friends were facing criminal charges similar to

those pending against the defendant, "... would have inured to the benefit of the defendant rather than the prosecution." *United States v. Quilca–Carpio*, 118 F.3d at 722.

**4.** The defendants state at page four of their post-hearing memorandum (Doc. 1294) that Juror 505's "capacity for remembering the details of his past appeared extremely limited." This statement is inaccurate an unjustified. I find that Juror 505's recollection of events was candid and entirely normal (especially for a typical layperson in the environment of a tense legal proceeding triggered by

of bias is utterly unwarranted and unjustified (and must be understood in the context of these defendants' grim history of attacks on judges, juries, and the judiciary in general in their concerted effort to move afoul of the law without any material, adverse consequence.)

In the district court's earlier opinion, the pertinent portion of the *voir dire* is described in detail:

> *Voir dire* commenced on May 28, 1997. The Court permitted the parties to suggest any questions for the jury during *voir dire*. The Court advanced all relevant inquiries suggested from counsel and the *pro se* defendants, including the following question: "Have any of you ever been charged with a crime? And by that I mean something that you understood might result in being imprisoned if you were convicted." Tr. Vol. 4 at p. 147, lines 13–16. The Court then questioned prospective jurors who responded affirmatively. When reaching Juror 505, the Court asked, "How about 505?" Tr. Vol. 4 at p. 148, lines 3–6. Juror 505 responded, "I was stopped last year and charged with driving with a suspended license. It was an unpaid traffic ticket. It has since been resolved, no problem." Tr. Vol. 4 at p. 148, lines 3–6. The Court moved directly to the next prospective juror. Neither the United States nor the defendants sought further information regarding Juror 505 or his responses to the Court. In fact, at the end of the day, the government's protests notwithstanding, the defense team sought successfully to prevent resumption of questioning at the onset of the next day's court session. Tr. Vol. 5 at p. 87–89.

10 F.Supp.2d at 1309–10.

The district court's earlier opinion discusses *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467 (11th Cir.1992), and iterates the governing test for juror prejudice:

> The first prong of the *McDonough* test requires a determination of whether the juror's answers were honest, "that is, whether he was aware of the fact that his answers were false." *United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir.1984). The second prong, that a correct response would have provided a valid basis for a challenge for cause, requires a showing of actual bias. *Id.* at 1532; *see also United States v. Casamayor*, 837 F.2d 1509, 1515 (11th Cir.1988).
>
> ... "Actual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" *Id.* (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976)).
>
> 955 F.2d at 1473.

10 F.Supp.2d at 1311–12.

The first part of the test is honesty. The principal incontestable fact about Juror 505's honesty is that he, along with a group of others, was asked if any of them had been "charged with a crime ... that might result in being imprisoned" and JUROR 505 RAISED HIS HAND. HE ANSWERED RATHER THAN REMAIN SILENT. Had he chosen dishonesty, he should have remained silent; he chose to

---

a group of defendants with a history of jury intimidation and obstructionism). He remembered important things and struggled only with unimportant details and fine legal distinctions (over which the lawyers themselves still cavil and argue).

answer.[5] He readily admitted the only episode that plausibly responded to the question. Further, he answered truthfully; he was, as he said, "stopped last year and charged with a suspended driver's license. It was an unpaid traffic ticket. It has since been resolved, no problem." These defendants quibble with Juror 505's answer and claim he should have stated fully his record, but he was never asked for his record by the court or the defense. Nothing that Juror 505 said during *voir dire* was untruthful. No dishonesty or deception occurred. A question was asked and the prospective juror voluntarily and truthfully responded.

During Juror 505's lengthy testimony (a several-hour marathon) on remand, he provided persuasive and credible testimony in response to an array of questions. For example, Juror 505 explained in detail that *after* the trial of these defendants, the state of Florida's Judge Baird relieved him from service of his forthcoming weekends in jail. Juror 505 perceives that Judge Baird acted primarily because Juror 505's mother had been seriously injured in an automobile accident and had lapsed into a coma, leaving no one on the weekends to care for Juror 505's children, who were in his custody. Judge Baird's affidavit emphasizes both Juror 505's fear of retaliation from these defendants and Judge Baird's satisfaction that Juror 505 possessed and presented a valid driver's license. (Ex. 2 of Dunnigan at August 13, 2002, hearing). In all events, the notion of a state judge's rewarding Juror 505 for service to the United States while on this jury and rewarding Juror 505 for the conviction of these defendants is utterly unwarranted, unsupported by any evidence, and manifestly foreign to Judge Baird's actions in Juror 505's state court proceeding. Any suggestion to the contrary is both without evidentiary support and an exercise in fantasy. The related notion that Assistant United States Attorney Peluso or anyone else influenced Juror 505 or Judge Baird by the mechanism of his probation is also without evidentiary support and partakes equally strongly of fantasy.

Juror 505 further explains that his mother's accident occurred *before* he was selected for jury service and that he mentioned this complication during *voir dire*, assuming this complication would result in his exclusion from the jury. Of course, if Juror 505 bore some venom or animus toward one or more of the defendants and consequently coveted the prospect of jury service, he should logically have not mentioned his mother's accident—but he did. The notion that Juror 505 connived to serve on this jury is both without evidentiary support and also an exercise in fantasy.

The defendants cite *Williams v. Netherland*, 181 F.Supp.2d 604 (E.D.Va.2002), *aff'd sub nom. Williams v. True*, 39 Fed. Appx. 830 (4th Cir. 2002), which is the district court's opinion after the remand in *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). The facts in *Williams* are stated succinctly by the district court:

> The jury forewoman, Bonnie Baker Meinhard Stinnett, failed to reveal during

---

**5.** The circuit court's opinion states, "During *voir dire* the district judge asked each prospective juror whether he or she had been 'charged with a crime....' " 271 F.3d at 964. This is both right and wrong. The question was asked simultaneously to a group of jurors, including Juror 505, but not individually to "each juror." Therefore, Juror 505 was not directly and individually asked the pertinent question; he volunteered his answer to a question posed to a group—a small but important distinction.

*voir dire* that one of the Common- wealth's witnesses, Deputy Sheriff Claude B. Meinhard, was her former husband and the father of her four children. Meinhard testified at Williams' trial about his investigation of the double homicide (the Keller murders) for which Williams was on trial. Juror Stinnett also failed to reveal that the prosecutor, Robert Woodson, Jr., had been her attorney during her divorce from Meinhard.

Stinnett was asked the following questions and gave the following responses during *voir dire*. The Court first read the name of the two prosecutors, including Robert Woodson, Jr., and the two defense attorneys and posed the following questions:

> The Court: Have you or any member of your immediate family ever been represented by any of the aforementioned attorneys?

Ms. Stinnett made no response (It was understood that no response was the equivalent of a negative response).

> . . . .

> The Court: Are any of you related to the following people who may be called as witnesses . . . Deputy Sheriff Claude Meinhard?

Again Ms. Stinnett made no response.

181 F.Supp.2d at 606. Stated simply, the silence of the juror in *Williams* constituted an active and wholly unjustifiable failure to disclose two matters, either of which would evidence a distinct and undeniable bias toward one party and either of which would warrant a challenge for cause. The matters were squarely sought in the *voir dire* questions and the juror's silence constituted a material evasion that establishes bias. In affirming the district court, the

Fourth Circuit, echoing the district court, stated:

> . . . Stinnett's *voir dire* responses were "intentionally misleading" because for unknown reasons, she "very much wanted to be on the jury" and "realized that revelation of her connections . . . might jeopardize her chances of being on that jury." Most importantly, the district court squarely held that "Stinnett was not a fair and impartial juror." In addition, the district court fond that Woodson knew of Stinnett's prior marriage to Meinhard and that his "silence affected Williams' fundamental constitutional right to an impartial jury and denied him due process of law."

39 Fed. Appx. at 833,.

In short, *Williams* is a thousand miles away from the present case. Juror 505 answered the question. Juror 505 answered truthfully. Juror 505 did NOT want to serve because his mother was in a coma and he was unable to care for his children. Juror 505 had no interest in the case or any participant on either side. Nothing that Juror 505 said or failed to say would have entitled the defense to a challenge for cause.

In *Carpa*, the circuit court mandated an inquiry into two questions that might be "appeal-determinative:"

> (1) whether juror 505 was influenced from the outset by the possibility of getting his sentence reduced so that his responses to the *voir dire* questions were deliberately deceptive (in fact, his sixty day custodial sentence was vacated because of his service on the jury); and (2) whether the Government's—the same prosecutor who tried the underlying case—unsupervised *ex parte* participation in the FBI investigation influ-

enced Juror 505 and/or Agent Coffin. Defendants may have failed to prove dishonesty and bias because they did not have the opportunity to participate (as did the prosecutors) in the investigation of Juror 505.

271 F.3d at 967–68.

After a hearing, followed by briefs and argument, I am satisfied beyond any doubt and find as a matter of fact (1) that Juror 505 was *not* influenced, from the outset or from any other time, by any prospective reduction in the terms of his probation and (2) that no participation in the district court's earlier investigation by the prosecutor, the FBI, or anyone else influenced Juror 505 in any way at any time (the defense summoned on remand not even a hint of any evidence to support the latter motion, which is another exercise in fantasy).

After compliance with the mandate of the circuit court and a detailed consideration of the resulting evidence, papers, and argument, I persist in my determination that the defendants' motions for a new trial (Doc. 1290, 1294) and related motions (Docs.1210, 1217, 1298, 1300) are without merit and, consequently, each is **DE-NIED.**[6]

---

**6.** These proceedings on remand have presented at least twice issues involving Ron Smith, former counsel for the late defendant Mokdad. One issue concerned whether he at some time represented Juror 505 in respect to the state court probation. This supposition apparently arises from an error by the state court reporter, who received from Ron Smith an electronic request for a transcript of Juror 505's state court hearing. The reporter (or perhaps someone else) entered Ron Smith's name erroneously as counsel while preparing the transcript. Juror 505 and Ron Smith agree that Ron Smith never represented Juror 505. The second issue relates to whether Ron Smith contacted Juror 505 after the trial, a course of action that might run afoul of Local Rule 5.01(d). After consideration, I credit Juror 505's recollection of the occasion (Transcript of hearing at 130–32) in question and, to the extent of the difference, reject Ron Smith's account. I expect that Ron Smith should acquire both a working knowledge of and a heightened deference to the boundaries of Local Rule 5.01(d), which prohibits unauthorized, post-trial contact with a juror.