Michael W. WILLIAMS, Petitioner,

v.

J.D. NETHERLAND, Respondent.

No. CIV.A. 3:96CV529.

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 24, 2002.

Theodore Floyd Adams, III, James Edward Moore, Christian, Barton, Epps, Brent & Chappell, Mark Evan Olive, VA, Capital Representation Resource Center, Inc., Barbara L. Hartung, Richmond, VA, John H. Blume, Columbia, SC, for Michael Wayne Williams.

Robert Quentin Harris, Donald Richard Curry, Office of the Attorney General, Richmond, VA, for J.D. Netherland, Warden.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPENCER, District Judge.

A.  *Procedural History:*

Petitioner, Michael Wayne Williams, was convicted of two capital murders and sentenced to death after a jury trial.  The Supreme Court of Virginia affirmed on direct appeal and later dismissed petitioner's state habeas petition.  He then sought federal habeas relief and requested an evidentiary hearing on constitutional claims that he had been unable to develop in state court proceedings.  Two of those claims are currently before the Court.  These claims are as follows:

(1) a juror failed to reveal possible sources of bias during voir dire and thus rendered his trial unfair;  and

(2) a prosecutor committed misconduct in failing to reveal his knowledge of the juror's possible bias.

The district court (Judge Robert R. Merhige presiding) initially granted a

hearing on those two claims. Before the hearing could be conducted, the Fourth Circuit granted the respondent's motion for an emergency stay and withheld judgment on the motion for a writ of prohibition and mandamus, on the grounds that a hearing was prohibited under 28 U.S.C. § 2254(e)(2). The District Court vacated its order granting a hearing and dismissed the petition since petitioner could not satisfy the requirements of 28 U.S.C. § 2254(e)(2). The Fourth Circuit affirmed. *Williams v. Taylor,* 189 F.3d 421 (4th Cir.1999).

The U.S. Supreme Court granted review, held that § 2254(e)(2) did not bar an evidentiary hearing because petitioner had exercised diligence in state court, and unanimously remanded the case for an evidentiary hearing. The Supreme Court directed that the lower courts "will take due account of the District Court's earlier decision to grant an evidentiary hearing based in part on its belief that "Juror Stinnett deliberately failed to tell the truth on voir dire." " [citation omitted] *Williams v. Taylor,* 529 U.S. 420, 444, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Prior to remand of the case, the judge to whom the case was originally assigned, the Honorable Robert R. Merhige, retired from his judicial office. The case was then reassigned to Judge James R. Spencer. A full evidentiary hearing was conducted before this Court on October 4, 2000.

B. *Petitioner's Claims:*

1. *Juror Misconduct Claim*

In claim I(A) of his habeas petition, Williams alleged that he was denied his right to be tried by an impartial jury and to select impartial jurors. The jury forewoman, Bonnie Baker Meinhard Stinnett, failed to reveal during voir dire that one of the Commonwealth's witnesses, Deputy Sheriff Claude B. Meinhard, was her for-

mer husband and the father of her four children. Meinhard testified at Williams' trial about his investigation of the double homicide (the Keller murders) for which Williams was on trial. Juror Stinnett also failed to reveal that the prosecutor, Robert Woodson, Jr. had been her attorney during her divorce from Meinhard.

Stinnett was asked the following questions and gave the following responses during *voir dire.* The Court first read the name of the two prosecutors, including Robert Woodson, Jr., and the two defense attorneys and posed the following question:

> The Court: Have you or any member of your immediate family ever been represented by any of the aforementioned attorneys?

Ms. Stinnett made no response (It was understood that no response was the equivalent of a negative response).

> The Court: Have you acquired any information about any of these offenses or the defendant Michael Wayne Williams, from the news media or any other source? That is, have you read any reports on this case in any newspaper or heard any reports on this case either on the radio or television?
>
> Ms. Stinnett: I have not.
>
> The Court: Are any of you related to the following people who may be called as witnesses ... Deputy Sheriff Claude Meinhard?

Again, Ms. Stinnett made no response.

During the federal habeas proceeding, Ms. Stinnett provided an affidavit. Ms. Stinnett stated that she did not respond to the Judge's question concerning the witnesses because she did not consider herself 'related' to Meinhard in 1994, the time of the jury selection. "Once our marriage ended in 1979, I was no longer related to him." (*See* Petitioner's Exhibit 7 at para-

graph 3). Stinnett also explained her failure to reveal Woodson's representation during her divorce:

When Claude and I divorced in 1979, the divorce was uncontested and Mr. Woodson drew up the papers so that the divorce could be completed. Since neither Claude nor I was contesting anything I didn't think Mr. Woodson represented either one of us. (*See* Petitioner's Exhibit 7 at paragraph 4).

### 2. *The Prosecutorial Misconduct Claim:*

In claim IV(A)(5) of his habeas petition, Williams alleged that prosecutor Robert Woodson's failure to disclose Stinnett's relationship to Meinhard and Woodson's prior representation of Stinnett constituted prosecutorial misconduct and denied him due process of law. The essence of this claim is that Woodson's silence deprived Williams of information required to challenge Stinnett for cause or to exercise his peremptory challenges.

During the federal habeas proceedings, Woodson also provided an affidavit. Woodson acknowledges that at the time of trial he knew that Ms. Stinnett and Deputy Meinhard were at one time married.

"I was aware that Juror Bonnie Stinnett was the ex-wife of then Deputy Sheriff Claude Meinhard and I was aware that they had been divorced for some time … To my mind, people who are related only by marriage are no longer 'related' once the marriage ends in divorce." (*See* Petitioner's Exhibit 12 at paragraph 2).

Woodson also declared under oath that he "had no recollection of having been involved as a private attorney in the divorce proceedings between Claude Meinhard and Bonnie Stinnett." (Petitioner Exhibit 12 at paragraph 3). "Whatever my involvement was in the 1979 divorce, by the time of trial in 1994 I had completely forgotten about it." *Id.*

### C. *Findings of Fact:*

1. Bonnie Baker Stinnett married Claude Meinhard in 1962. The couple had four children. They separated in 1977 and were divorced in 1979.

2. In the divorce proceedings, Stinnett was represented by Robert G. Woodson, Jr. She was the complainant in the uncontested divorce. Ms. Stinnett met with Mr. Woodson on two occasions to prepare the divorce pleadings and for depositions. Claude Meinhard was present at one of these meetings.

3. Bonnie Stinnett was given custody of the children and she remained in the marital home in Cartersville in Cumberland County.

4. Claude Meinhard was given visitation rights, which he exercised both before and after the divorce.

5. Stinnett received and kept a copy of her divorce decree and the deed transferring the marital home to her. Both documents were prepared by Robert Woodson.

6. Claude Meinhard was remarried to Phyllis Lane in 1980.

7. Bonnie Stinnett was remarried to Harold Stinnett in 1988.

8. Mr. Meinhard paid child support in the amount of $100.00 per week. The child support was paid on a weekly or biweekly basis starting in 1977. Mr. Meinhard continued to pay child support regularly until the youngest child turned 18 in 1990. He made additional payments until 1994 for that child's college expenses.

9. Because of the children that they shared in common, Bonnie Stinnett and Claude Meinhard continued to have limited contact with each other up until the time of the Williams trial.

10. Stinnett and Meinhard both continued to live in the same small rural community in Cumberland County, Virginia after the divorce and up until the date of the Williams trial.

11. During their marriage, Meinhard was employed by the Virginia State Police as well as a local correctional facility. He later joined the Cumberland County Sheriff's Office where he was the Chief Deputy Sheriff in 1994. He is now the Sheriff of Cumberland County.

12. Bonnie Stinnett graduated from Longwood College in 1966. She taught school continuously from 1968 until she retired in 2000. Ms. Stinnett taught history, government and civics during her career.

13. Morris and Elizabeth Keller were robbed, murdered and their home burned in February, 1993, in Cumberland County. Michael Wayne Williams and Jeffrey Cruse were arrested for the offenses.

14. The Kellers' murders, the defendants' arrest and the pretrial proceeding generated an extraordinary amount of media coverage in Cumberland County and surrounding areas. The case was the subject of stories in the newspapers, radio and television. The case was also a constant topic of conversation throughout the Cumberland County community.

15. Bonnie Stinnett's husband Harold read the newspaper daily. He also watched the news on television. Harold Stinnett and her children discussed the media items relating to the Kellers' murders with each other and with Ms. Stinnett.

16. Bonnie Stinnett knew Morris Keller's (victim) brother, Jimmy Keller. Jimmy Keller was a fairly well known local banker. Ms. Stinnett and Morris Keller's sister had attended grade school together.

This particular sister died when she and Ms. Stinnett were in the seventh grade.

17. In 1971–72, Elizabeth (Beth) Keller (victim) attended the Powhatan public school where Ms. Stinnett taught history and government. Ms. Stinnett had no recollection of this at the time of the Williams trial.

18. Beth Keller's mother was Mary Carter Williams. Mrs. Williams was a bus driver for the Powhatan schools. She drove buses continuously for the Powhatan school system from 1991–1999.

19. Bonnie Stinnett attended the bus loading area each day at Powhatan Middle School beginning in 1992 up until 2000.

20. Both Claude Meinhard and Mary Carter Williams were witnesses at petitioner Michael Williams' trial. Their names were among those read to the prospective jurors.

21. Claude Meinhard was present in the courtroom during jury selection.

22. Bonnie Stinnett was served a jury summons in December, 1993, by then Sheriff Smith. She returned a jury questionnaire dated December 23, 1993, and did not ask to be excused for any reason.

23. During *voir dire*, Ms. Stinnett did not respond when asked if she was related to any prospective witness. Stinnett testified that she did not consider herself "related" to Claude Meinhard once they were divorced. She submitted an affidavit to that effect in 1998.

24. Considering the length of their marriage, the fact that they had four living children in common, Stinnett's receipt of Meinhard's child support payments from 1977–1990 (and education expenses through 1994), and their continued limited contact through the date of the trial and Claude Meinhard's presence in the courtroom during *voir dire*, the Court finds

Stinnett's response was intentionally misleading and obstructed and/or impeded the purpose of *voir dire*. Ms. Stinnett is an educated person, well aware that one primary purpose of *voir dire* is to probe for possible connections to the parties, lawyer and witnesses, that might be a source of bias. Ms. Stinnett was an articulate experienced teacher of history, government and civics. The Court's close observation of Ms. Stinnett leads to the conclusion that she is intelligent, incisive and a very strong personality. She is not a shrinking violet. In fact, she could be aptly described as assertive. For reasons that the Court is unable to determine on this record, Ms. Stinnett very much wanted to be on the jury in the Williams case. She realized that revelation of her connections, past and present, to Claude Meinhard might jeopardize her chances of being on that jury. The Court finds that Stinnett did not simply make a mistake when she failed to disclose her prior marriage to Claude Meinhard, a prosecution witness.

25. During *voir dire*, Ms. Stinnett also did not respond when asked if she or an immediate family member had been represented by any of the attorneys involved in the trial. Stinnett testified that she did not believe Woodson had "represented" her since the divorce was uncontested. She also submitted an affidavit to that effect in 1998.

26. Here again Ms. Stinnett's failure to respond was intentionally misleading and at odds with the purpose of *voir dire*. The facts support no other conclusion but that Woodson represented Stinnett in her divorce from Claude Meinhard. According to Ms. Stinnett the only time she used or had any involvement with an attorney was during her divorce proceedings. Ms. Stinnett retained in her continuous possession, her divorce decree and house deed since 1979. Both documents clearly indicated

Woodson's involvement, as an attorney, in the divorce case. A divorce is a significant, memorable and sometimes painful event, especially when the custody and support of children are involved. It is not likely that Ms. Stinnett would have forgotten about her divorce to Meinhard during *voir dire*, when the man she had been married to for 17 years was sitting right there in the courtroom. The Court finds that Ms. Stinnett willfully failed to disclose her prior representation by Woodson, again understanding full well that such disclosure would jeopardize her opportunity to serve on the Williams jury.

27. During *voir dire*, Ms. Stinnett denied that she had acquired any information about the offenses or the defendant from the media. She was asked if she had "acquired any information about any of these offenses or the defendant, Michael Wayne Williams, from the news media or any other source. That is, have you read any reports on this case in any newspaper or heard any reports on this case either on the radio or television?" Ms. Stinnett testified at the evidentiary hearing that she, once again, carefully parsed the trial judge's question and interpreted it to refer only to TV, radio or news stories which she personally read, heard or watched. Therefore, even though she knew full well that her husband and children had read, heard and seen stories and she was aware that the information they provided to her in discussions about the case came from the media, she did not feel obligated to so inform the Court.

28. The Court finds that, here again, Ms. Stinnett gave an intentionally false and misleading answer and impeded the *voir dire* process. Ms. Stinnett recognized that the purpose of the Judge's question regarding pretrial acquisition of information about the offense or the defendant was to ascertain the nature of such infor-

mation and then to determine if said information would impact a potential juror's ability to be impartial. Any potential juror, including Ms. Stinnett, would have realized that prior knowledge about the case would be relevant when selecting impartial jurors. This is evident by the fact that other jurors who had just "heard talk" about the case responded affirmatively to the same question. Given Ms. Stinnett's background and obvious intelligence, she certainly understood this.

29. Based on Ms. Stinnett's failure to provide complete and accurate responses to a number of questions during *voir dire*, as described above, the Court finds that Ms. Stinnett was not a fair and impartial juror.

30. Commonwealth's Attorney Woodson knew Ms. Stinnett was divorced from Claude Meinhard and that Mr. Meinhard would be a trial witness.

31. Woodson and Meinhard had worked together since 1989 when Woodson became Commonwealth's Attorney.

32. Robert Woodson prepared a deed for Meinhard and his brother in 1993.

33. Mr. Woodson had also represented Meinhard's wife, Phyllis, in her divorce from her previous husband. He also represented Alice Stinnett, Harold Stinnett's ex-wife in her divorce from Harold Stinnett, Bonnie Stinnett's current husband.

34. Prior to jury selection, Commonwealth's Attorney Woodson asked Meinhard about the divorce and whether Ms. Stinnett would be adverse to the Commonwealth due to any hostility arising from the divorce.

35. Commonwealth's Attorney Woodson had no recollection at the time of the Williams trial of his role (as a lawyer) in the Stinnett/Meinhard divorce.

36. Meinhard informed Warren Von Schuch of the Stinnett/Meinhard divorce prior to jury selection. Von Schuch's trial notes state "married to C. Meinhard."

37. Mr. Von Schuch is a very skilled and experienced capital prosecutor with over 25 years' experience trying felony and capital cases. Woodson had little or no experience with prosecuting capital cases. Von Schuch was brought in to handle the bulk of the trial preparation. Von Schuch acknowledged at the evidentiary hearing that he was probably busy with other trial preparation and this is why the information regarding the Stinnett/Meinhard divorce (which he obviously recognized to be relevant and material) "got by him."

38. Neither Woodson or Von Schuch ever informed the trial judge or the Williams defense lawyers of the Stinnett/Meinhard prior marriage and divorce. They also did not raise it on *voir dire* with Ms. Stinnett.

39. When Ms. Stinnett denied any relationship to Meinhard, neither Woodson or Von Schuch made any effort to put on the record the information they had regarding the prior marriage and divorce of Stinnett and Meinhard. In fact, Woodson testified that he did not consider Stinnett to be related to Meinhard since they were divorced. At the same hearing, Von Schuch candidly admitted that if he had been thinking about that information at the time he would have disclosed it so as to protect the record and the validity of any subsequent guilty verdict.

40. Although Woodson was concerned about possible bias to the Commonwealth from the Stinnett/Meinhard relationship, astonishingly he never considered its impact on the defense. Woodson does not believe that he had any ethical duty to disclose these facts to the Court or to defense counsel. If the shoe were on the other foot, it is hard to imagine that Wood-

son would maintain these views. That is, what if the prospective juror had been married to and now divorced from the defendant and the defense lawyers knew about it and failed to disclose the information?

41. The defense lawyers, Don Ford and Lucretia Carrico, were unaware of the Stinnett/Meinhard relationship until some years after the trial.

42. Ford and Carrico believed that the extensive pretrial publicity was prejudicial to Williams. The two attorneys questioned jurors about their exposure to pretrial publicity and prior knowledge of the case or the victims. They also moved unsuccessfully for a change of venue.

43. Ford and Carrico, based on their experience, held the view that jurors with law enforcement backgrounds or connections were detrimental to a defendant. Absent other strong counter balancing factors, they would move to challenge such jurors, or, if unsuccessful, use a peremptory challenge to remove the potential juror.

44. Ford and Carrico questioned jurors to elicit their views about the death penalty and to uncover relationships to the trial attorneys, the witnesses, the defendant, the victims, and the victims' families.

45. Ford's *voir dire* of Ms. Stinnett in this case demonstrated his concern that she might automatically impose a death sentence upon a finding of guilt.

46. Both Ford and Carrico stated that they would have had a sufficient basis to challenge Ms. Stinnett for cause if they had known of her prior marriage to trial witness, Deputy Sheriff Claude Meinhard and her prior representation by Common-

wealth's Attorney Woodson. According to Ford and Carrico they would have viewed her marriage to Claude Meinhard, who in addition to his position as Deputy Sheriff was also formerly a State trooper and prison guard, an automatic disqualifier.

47. Both Ford and Carrico stated that Stinnett's unrevealed exposure to pretrial publicity about the case would have mandated further followup questions.

48. The trial judge excused other jurors for cause based on exposure to pretrial publicity, law enforcement background or connections, former representation by trial attorneys and relationships to victims or the defendant.

49. The Virginia Rules of Professional Responsibility in effect at the time of Williams' trial required that the prosecutors promptly inform the Court of any juror misconduct (such as false or misleading responses to *voir dire* questions) especially if it involves potential bias. A prosecutor has a duty to ensure that the trial process is fair.

50. The Court finds that Woodson and Von Schuch had a duty to reveal Stinnett's prior marriage and divorce from Meinhard irrespective of the specific *voir dire* questions.

51. The Court finds that Woodson and Von Schuch acted improperly and in violation of their prosecutorial obligations in regards to juror Stinnett.[1] They were concerned about Stinnett's impartiality even though the divorce had occurred many years before the trial. They failed to appreciate, however, that the Court and defense counsel had an equally compelling interest in full disclosure of the facts of

---

1. In fairness to Von Schuch, the Court should note that the evidence indicates that Von Schuch was busy working on other matters and he did not focus on the Stinnett/Meinhard issues. Woodson on the other hand was very involved with the issue and made a direct inquiry of Meinhard to determine if Stinnett might be biased against the Commonwealth because of the prior marriage and divorce of Stinnett and Meinhard.

Stinnett's background. Not only had Stinnett been married to a prosecution witness, that prosecution witness was also a long time law enforcement officer. These unrevealed facts were clearly relevant to Stinnett's fitness to serve on Williams' capital jury and to Williams' ability to select impartial jurors.

## D. *Conclusions of Law*

### 1. *Juror Misconduct:*

#### a. Bias based on dishonesty—*McDonough* claim

■ Petitioner states a violation of his sixth amendment right to a trial by an impartial jury if the facts show that juror Stinnett gave false and deceptive answers during *voir dire* and that honest answers would have provided the grounds for a for-cause challenge.

Juror Stinnett gave incorrect or misleading responses to questions about her relationship to Meinhard (a law enforcement witness), about her prior client relationship to Woodson (the prosecutor), and about her exposure to pretrial information about the case. These facts and others leads this Court to conclude that Ms. Stinnett's misleading responses were given so as to avoid challenge. This conclusion leads to the very real and disturbing probability that juror Stinnett was biased.

#### (i) *Dishonesty*

■ When a juror gives a knowingly false response to a material question on *voir dire* the defendant is entitled to a new trial. Recognizing this rule, the District Court (Merhige, judge presiding at that time) in early proceedings in this case initially granted an evidentiary hearing based in part on the belief that "juror Stinnett deliberately failed to tell the truth on *voir dire*." *Williams v. Netherland,* C.A. No. 3:96CV529 (E.D. Va. April 13,

1998). In remanding Williams' case for an evidentiary hearing the United States Supreme Court directed this Court to take due account of Judge Merhige's earlier decision. *Williams v. Taylor,* 529 U.S. at 444, 120 S.Ct. 1479.

The District Court's decision ordering an evidentiary hearing relied on *United States v. Bynum,* 634 F.2d 768, 771 (4th Cir.1980). Although decided before *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), *Bynum* is consistent with *McDonough;* indeed it is especially instructive here because it too involved a juror's repeated failure to disclose material information during *voir dire.*

The juror in *Bynum* had served on two juries in two separate criminal trials. In the first trial, the juror said nothing when asked whether "any person to whom you feel especially close … has ever been convicted of a crime …" *Id.* at 769. In the second trial, the juror said nothing when asked if he had a close family relative "who had been convicted of a crime." *Id.* at 770. In fact the juror's brother, sister-in-law, and a nephew all had criminal convictions. At a post trial hearing the juror testified that he did not respond to the question at the first trial because he was not "close" to his brother, sister-in-law, or nephew; and he kept silent at the second "for reasons of shame and embarrassment." *Id.* at 771.

The Fourth Circuit reversed the convictions in both cases. In light of the juror's second explanation—that he was ashamed and embarrassed—the Fourth Circuit found that his first explanation that he was not "close" to his relatives—could not be credited. *See id.* The *Bynum* court recognized that a juror's deliberate concealment of important information bearing on the juror's ability to be impartial deprives a defendant of his right to a fair trial:

Certainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on *voir dire,* the result is deprivation of the defendant's rights to a fair trial.

*Id.* at 771

*Bynum* teaches two important lessons for the case at hand. First, a finding by this Court that Ms. Stinnett intentionally concealed material information during *voir dire* mandates relief. Second, in making this determination, Ms. Stinnett's individual responses during *voir dire* and her explanations of those responses at the evidentiary hearing cannot be viewed in isolation. In particular a finding that Ms. Stinnett intentionally concealed information on one occasion (or more) undermines the credibility of her other responses.

*McDonough,* decided shortly after *Bynum,* likewise involved false juror responses during *voir dire.* The juror in *McDonough* gave a "mistaken" though honest answer to a question about "injuries ... that resulted in any disability or prolonged pain or suffering." *Id.* at 555, 104 S.Ct. 845. The Court held:

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.

*Id.* at 556, 104 S.Ct. 845. Two Justices (Stevens and O'Connor) joined in a separate concurrence by Justice Blackmun, who wrote:

> [I]n most cases the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial.

*Id.* at 557, 104 S.Ct. 845. In any event, a new trial is required whenever the surrounding facts and circumstances demonstrate that a juror is actually or impliedly biased, even if the juror's answers to particular questions during *voir dire* were completely honest. *See id.* at 557, 104 S.Ct. 845.

In a second concurring opinion, Justice Brennan, joined by Justice Marshall, emphasized that the focus must be on the bias of the juror and the prejudice to the litigant. The juror's own view of the challenged response is irrelevant:

> One easily can imagine cases in which a prospective juror provided what he subjectively believes to be an honest answer, yet that same answer is objectively incorrect and therefore suggests that the individual would be a biased juror in the particular case.

*Id.* at 559, 104 S.Ct. 845.

Applying *McDonough,* the Court looks first at the three questions and responses dealing with Meinhard, Woodson and pretrial information about the case. Each question was obviously material because each sought to identify potential sources of partiality or bias. Additionally, each question could have elicited a reply resulting in Stinnett's removal for cause. In fact, other potential jurors were removed based on their responses to the same areas of inquiry.

Stinnett's belief that she was not "related" to Meinhard and therefore did not need to reveal their former marriage was objectively incorrect in the context of jury selection proceedings. Stinnett is the mother of Meinhard's four children. That fact alone establishes a relationship. Given the length of their marriage (17 years), their four children, Stinnett's receipt of child support payments from 1977 to 1990

and their continued limited contact up to 1994, Stinnett's failure to respond concealed her relationship to a prosecution witness and the possible bias that went along with it. Indeed, prosecutor Woodson himself recognized the importance of Stinnett's marriage to and divorce from Meinhard, which is precisely why he questioned Meinhard on that very issue before the trial.

Both defense counsel believed as a general rule that jurors with law enforcement connections were detrimental to a defendant's interest. Consequently, they tried to discover and remove such jurors. Yet because Stinnett failed to reveal her prior marriage, defense counsel never discovered her connection to law enforcement or to a prosecution witness. During their marriage, Meinhard was first a State trooper and then an employee of a local prison. Meinhard then testified as a law enforcement witness for the prosecution. Both defense attorneys testified that this information would have provided a valid basis for a for-cause challenge.

Stinnett's belief that she need not reveal her prior contacts with Woodson because he had not "represented" her was also objectively incorrect. On this point, the United States Supreme Court wrote:

> Stinnett's failure to divulge material information in response to the second question was misleading as a matter of fact because, under any interpretation, Woodson had acted as counsel to her and Meinhard in their divorce.

*Williams,* 120 S.Ct. at 1493. Since 1979, Stinnett had kept in her possession her divorce decree and her house deed, both of which reflected Woodson's representation. Moreover, Stinnett had divorced only once and had employed an attorney on no other occasion. Her past contacts with Woodson should have been memorable.

Once again Stinnett's silence impeded the goal of *voir dire* to expose "possible biases, both known and unknown on the part of potential jurors." *McDonough,* 464 U.S. at 554, 104 S.Ct. 845. In view of her contemporaneous failure to reveal her prior marriage to Meinhard, the Court cannot dismiss this omission as an honest mistake. Stinnett also gave contradictory testimony at the evidentiary hearing on this point, saying first that she did not think Woodson had "represented" her and later that she had never even thought about her divorce when responding to the *voir dire* questions. Stinnett manages to think about her divorce to make an assessment that Woodson didn't "represent" her and yet at the same time she claimed she did not think about her divorce during *voir dire.* Again the question was material for it involved a prior relationship with the trial prosecutor that would have provided the basis for a valid for-cause challenge.

Finally, Stinnett's failure to acknowledge her exposure to pretrial information about the case was also objectively incorrect. The trial court asked the following:

> Have you acquired any information about any of these offenses or the defendant, Michael Wayne Williams, from the news media or *any other source?* That is, have you read any reports on this case in any newspaper or heard any reports on this case either on the radio or television? (Emphasis added)
>
> Ms. Stinnett: I have not.

By her own admission, Stinnett received information from her husband, her children and friends and acquaintances in the community and at her school. However, Stinnett said nothing when asked about information received from "any other source." Stinnett also admitted that these sources no doubt had read or heard media reports about the offenses and the defendant which they then repeated to her.

Stinnett did not disclose her receipt of these media reports. When Stinnett affirmatively denied reading or hearing about the case, she deflected any further inquiry into a possible area of bias. Her denials of any prior media exposure regarding this very high profile case were not credible. Once again the question was material and several prospective jurors were excused based on opinions formed after exposure to media reports and talk in the community.

The Court's review of Stinnett's answers/non-answers to these three questions, together with her testimony during the evidentiary hearing, leads to the following conclusion: unlike the juror in *McDonough*, Stinnett did not make an "honest mistake" when she failed to answer properly three material and critical questions. The clear import of the *voir dire* was to determine whether the prospective jurors had any past or present relationship to trial participants or had obtained any knowledge about the case. As an educated person and experienced teacher, Stinnett certainly understood these objectives. A common sense analysis of her subsequent explanations finds them to be contradictory and mere *post hoc* justification.

In concluding that Stinnett gave purposely erroneous and misleading responses, the Court has considered the disputed responses collectively. Following the Fourth Circuit's analysis in *Bynum*, the Court finds that Stinnett's failure to disclose her prior marriage to Meinhard must be viewed in light of her failure to disclose her representation by Woodson and in light of her failure to disclose exposure to information about the case. One such instance standing alone might support a finding of inadvertence. Three such instances do not. The Court therefore finds that Stinnett's failure to disclose material information during *voir dire* was deliberate and intentional.

### b. *Basis for a For–Cause Challenge:*

■ The second part of the *McDonough* test provides that a correct response by the juror would have provided a valid basis for a cause challenge. Had Stinnett revealed the true facts, defense counsel certainly could have challenged her for cause. Cause challenges are governed by Virginia Supreme Court Rule 3A:14. The Court "may excuse a prospective juror if it appears he is not qualified, and another shall be drawn or called[.]" The Court need not await a cause challenge but may excuse a prospective juror on its own motion. Va. S.Ct. R 3A:14(2) (1999). The decision to exclude a juror for cause is within the sound discretion of the trial court. *See Stockton v. Commonwealth*, 241 Va. 192, 200, 402 S.E.2d 196, 200 (1991); *Martin v. Commonwealth*, 221 Va. 436, 445, 271 S.E.2d 123 (1980). Under State law, where a reasonable doubt exists as to whether a juror is qualified, that doubt must be resolved in favor of the accused. *See Salina v. Commonwealth*, 217 Va. 92, 94, 225 S.E.2d 199, 200 (1976); *accord Cantrell v. Crews*, 259 Va. 47, 51, 523 S.E.2d 502, 504 (2000). Applying these principles, the Court is confident that Stinnett would not have been seated on Williams' jury had all the facts been known.

During jury selection at Williams' trial, thirteen jurors were dismissed for cause. One was dismissed because she had worked as a corrections officer six years prior to the trial. A second juror was dismissed because he was prosecutor Woodson's first cousin. A third juror was dismissed because he equivocated when asked whether he would automatically impose the death penalty. Several were dismissed due to exposure to pretrial information about the case. In contrast to Stinnett, these jurors all revealed the rele-

vant information to the Court and the parties.

Defense counsel testified that the trial court was liberal with challenges for cause. Had the trial court and defense counsel known of Stinnett's ties to a law enforcement witness, to the prosecutor, and of her exposure to information about the case, they would have had a valid basis for a for-cause challenge; moreover, that challenge (if made) would certainly have been granted. Furthermore, the trial court could have moved to exclude her on the Court's own motion.

In sum, the Court holds that Williams has satisfied the test set forth in *McDonough*. Stinnett intentionally failed to answer not one but three material questions in an objectively correct manner. Had she done so, Williams would have had a valid basis for a challenge for cause. Additionally, the trial court could have removed Stinnett on its own motion. No further demonstration of harmfulness is required under *McDonough*. Williams was denied his Sixth Amendment right to an impartial jury. The writ could be granted on this basis alone.

### 2. *Bias Based on Implied Bias:*

Based on a review of the facts as found by this Court and the controlling legal authority, Williams has also demonstrated *implied* bias on the part of Stinnett. A juror can, of course, be biased even though she answers honestly all the questions put to her during *voir dire. See, e.g. Fitzgerald v. Greene*, 150 F.3d 357, 362–63 (4th Cir.1998). Also, under certain circumstances, her bias will be implied as a matter of law. Indeed because a juror will rarely admit to being biased, the existence of bias must instead be inferred from all surrounding facts and circumstances. Justice O'Connor's concurrence in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71

L.Ed.2d 78 (1982), foresaw the situation here:

> While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, *that the juror is a close relative of one of the participants in the trial or the criminal transaction*, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of "no bias," the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances.

*Id.* at 222, 102 S.Ct. 940 (emphasis added) *See also Person v. Miller*, 854 F.2d 656, 664 (4th Cir.1988) (noting that implied bias arises when there is a relationship between juror and some aspect of the litigation making it highly unlikely that the average person could remain impartial).

The Fourth Circuit addressed a claim of implied bias in *Fitzgerald v. Greene*, 150 F.3d 357 (4th Cir.1998). The defendant in *Fitzgerald* was on trial for capital murder and rape. One of the jurors had not been asked and had not revealed that his granddaughter had been molested. During sentencing deliberations, the juror disclosed this fact to his fellow jurors while urging that they impose a life sentence for rape. His statement was reported to the trial judge after the verdict. A prompt post-trial hearing was conducted, but the trial court found no evidence of actual bias.

In subsequent federal habeas corpus proceedings the defendant raised a claim of implied bias. Citing *Smith v. Phillips* and *Person v. Miller*, the Fourth Circuit emphasized that the implied bias doctrine required "exceptional" and extraordinary situations. In rejecting the defendant's

implied bias claim the Court explained: "This is not such an egregious situation. Neither [the juror] nor anyone in his family was personally connected to any of the parties in the case. The circumstances of this case simply do not give rise to a presumption of bias." 150 F.3d at 365.

■ In contrast to the juror in *Fitzgerald,* Stinnett was personally connected to several parties in the case. Indeed the multiple sources of bias impinging on Stinnett makes this case precisely the kind of exceptional case for which the implied bias doctrine is needed.

Stinnett's bias can be implied from several facts. First, Stinnett failed to answer three material questions fully and correctly. Even if one credits Stinnett's testimony that she believed her responses were correct (and the Court does not) the fact that she was—however unwittingly—laboring under multiple sources of bias plainly calls into question her partiality and warrants an implication of bias.

Second, additional and exceptional facts elicited outside of *voir dire* during the evidentiary hearing also support a finding of implied bias.

- Stinnett was acquainted with the male victim's brother, a prominent banker in her small, rural community.
- Stinnett had been a classmate of the male victim's sister.

Stinnett's relationship to several of the trial participants, pretrial exposure to media coverage of this shocking and sensational multiple murder and her apparently very strong desire to sit on the Williams jury make it highly unlikely that she remained impartial during deliberations. The Court therefore implies on the basis of these facts that Stinnett was biased. She had no business sitting on Williams' jury. Unfortunately, Ms. Stinnett was the only one totally aware of that during the trial.

### 3. *Harmless Error Analysis Does Not Apply*

■ The Supreme Court has recognized that some errors impact the very trial process itself such that any effort to assess the impact of such errors on the outcome of the proceeding would be nothing more than rank speculation. Such errors are deemed "structural" in nature and are accordingly immune from harmless error analysis. A biased judge is one example of a structural error immune to harmless error analysis. *See Arizona v. Fulminante,* 499 U.S. 279, 310–11, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (right to impartial judge not subject to harmless error review). Reason and logic dictate that a biased juror should be treated the same way. The constitutional right to have an impartial jury decide the accused's fate would be an empty promise if an appellate court could decide after the fact that, although the jury was not impartial, it would have made no difference in the ultimate decision to convict. There is no basis beyond sheer speculation for such a conclusion. The presence of a biased juror no doubt infects and pervades the entire trial proceedings and influences the jury's deliberations from start to finish. Harmless error analysis is completely inapt and inappropriate under these circumstances.

This Court specifically holds that the juror bias—like judicial bias—is a structural error to which harmless error analysis has no application. Juror Stinnett was a biased juror; her presence on the jury violated Williams' Sixth Amendment right to an impartial jury; and the writ must therefore be granted.

### 4. *The Prosecutorial Misconduct Claim*

■ All of the problems with juror Stinnett could have been avoided if only the

two trial prosecutors had acted in accordance with their professional obligations. Their failure to do so resulted in the seating of a biased juror and deprived Williams of his right to a fair trial with an impartial jury. When initially granting an evidentiary hearing on this claim, then District Judge Merhige concluded:

> [Woodson's] subsequent failure to advise the Court or defense counsel of juror Stinnett's dishonesty had a substantial and injurious effect on Williams' ability to select impartial jurors.

*Williams v. Netherland*, C.A. No. 3:96CV529 (E.D. Va. April 13, 1998). The writ must be granted on this basis also.

Both Woodson and Von Schuch knew of Stinnett's marriage to and subsequent divorce from Meinhard. That fact is recorded in Von Schuch's *voir dire* notes. Woodson admitted questioning Meinhard shortly before the trial about Stinnett's possible bias from that divorce. Neither Woodson nor Von Schuch advised defense counsel or the trial judge of the Stinnett/Meinhard marriage and divorce. Neither questioned Stinnett about these facts during the *voir dire*. When Stinnett failed to respond when asked if she were "related" to Meinhard, Woodson and Von Schuch sat silently. Woodson testified that he had no recollection of his part in their divorce. Hence, Woodson did not respond when Stinnett failed to disclose that he had represented her.

As a result of the two prosecutors' silence, the relevant facts were not revealed then or later, and the trial court was unable to address the issue before the jury was seated or the trial was completed. An attorney, an officer of the Court, cannot remain silent when a juror fails to respond truthfully, and he cannot conceal relevant information. *See, e.g., United States v. Kojayan*, 8 F.3d 1315 (9th Cir.1993) (finding prosecutor's untruthful statement

about existence of plea agreement with witness constituted prosecutorial misconduct). The prosecutor's own admitted concerns about Stinnett required disclosure to the trial court.

Woodson never revealed his pretrial conversation with Meinhard until he was compelled to do so in his federal deposition. He also did not reveal that he told Von Schuch about the divorce until that deposition. Woodson's 1998 affidavit omitted these facts. Von Schuch revealed his knowledge of the Stinnett/Meinhard marriage and divorce along with the contents of his *voir dire* notes when required to respond during federal discovery. Thus, this significant information was not available during State appellate and habeas proceedings.

The Virginia Rules of Professional Responsibility in effect at the time of the Williams' trial required the prosecutors to promptly inform the Court of any juror misconduct, especially if it involved bias. DR7–107(F). That duty included a duty to report inaccurate or misleading statements by a potential juror. However, rather than permitting the Court and defense counsel to make an independent assessment of Stinnett's fitness to serve as a juror, Woodson and Von Schuch remained silent. In doing so, they usurped the Court's role.

The prosecutors' actions at trial were inconsistent with their professional obligations. "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). *See also Berger v. United States*, 295 U.S. 78, 88–89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In this case the prosecutors' silence affected Williams' fundamental constitutional right to an impartial jury and

denied him due process of law. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 647–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

### *Conclusion*

If the constitutional guarantees which we hold dear are to have any meaning in the context of a criminal trial, a defendant must be entitled to an impartial jury: a jury not populated with persons who bring prejudice, bias or a closed mind to the serious task of judging another human being and making critical decisions regarding the deprivation of their liberty or their very existence as a living soul. For the reasons previously discussed, this Court finds that Petitioner's fundamental constitutional right to a fair and impartial jury has been violated. The petition for a writ of habeas corpus is therefore granted.

An appropriate Order will issue.

### *FINAL ORDER*

This matter comes before the Court on petitioner Michael W. Williams' application for habeas corpus relief, pursuant to 28 U.S.C. § 2254. Mr. Williams challenges his 1994 conviction and subsequent sentencing by the Circuit Court of Cumberland County, Virginia, for capital murder.

For the reasons stated in the accompanying Findings of Fact and Conclusions of Law, the Court hereby Adjudges and Orders that Mr. Williams' petition for habeas corpus relief is hereby GRANTED in the following respect:

The conviction and the sentence of death imposed by the Circuit Court of Cumberland County, Virginia, in accordance with the verdict of that Court, are declared NULL and VOID. The Commonwealth of Virginia shall, within one hundred and twenty (120) days of this date, provide the Petitioner with a new trial pursuant to the Procedures set forth in Virginia Code Annotated §§ 19.2–264.3 and 264.4, and any other applicable statute.

Unless an appeal from this Final Order is taken to the United States Court of Appeals for the Fourth Circuit within thirty (30) days of this date, the Clerk shall return all state court records held by her to their appropriate custodians.

The Clerk is DIRECTED to send a copy of this Final Order to all counsel of record.

And it is SO ORDERED.